RECEIVED

**IN THE DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**(RICHMOND DIVISION)**

2020 JUN 30  A II: 30

DISTRICT COURT
VIRGINIA

| | | |
|---|---|---|
| MICHAEL D. WEBB, A/K/A MAJOR | ) | |
| MIKE WEBB, D/B/A FRIENDS FOR | ) | |
| MIKE WEBB and MAJOR MIKE WEBB | ) | |
| FOR U.S CONGRESS | ) | |
| **Petitioner, *Pro Se*** | ) | |
| | ) | **Case Number:**  3:20cv497 |
| v. | ) | |
| | ) | |
| RALPH NORTHAM, in official and | ) | |
| individual capacity, MARK HERRING, | ) | |
| in official and  individual capacity,  STATE | ) | |
| BOARD OF ELECTIONS and COUNTY | ) | |
| OF ARLINGTON | ) | |
| **Respondents** | ) | **Demand for Jury Trial** |
| | ) | |
| | ) | |

**<u>VERIFIED COMPLAINT</u>**

1. And, comes now to the court the *Pro Se* Petitioner Major Mike Webb, also known as Michael

   David Webb, and Mike Webb, doing business as Friends for Mike Webb, and Major Mike

   Webb for U.S. Congress (VA8), hereinafter referred to as "Webb," to file a Verified Civil

   Complaint, averring, an as applied challenge, through a declaratory judgement, as authorized

   pursuant to the *Declaratory Judgments Act*, 28 U.S.C. § 2201 *et seq.*,  and, in accordance

   with *Crawford v. Marion County Election Board*, 553 U.S. 181, 128 S.Ct. 1610, 170 L.Ed.2d

   574 (2008), that Governor Ralph Northam, by and through implementation of Executive

   Order 63, with the State Board of Elections, mandating the use of nonmedical grade facial

   coverings in certain public settings, "substantially burdens the right to vote in violation of the

   *Fourteenth Amendment*; that it is neither a necessary nor appropriate method of avoiding. . .

   [microbial infection]; and that it will arbitrarily disfranchise qualified voters who do not. . .

[subscribe to the opinion that a mere facial covering does, in fact, prevent microbial infection, a politically divided issue] and will place an unjustified burden on those, like himself, who cannot" or will not do so, entitling Petitioner to a favorable judgment as a matter of law, and the recent opinion of the U.S. Supreme Court in 591 U.S. __ (2020), that, "taken together, the. . . findings and evidence underlying them are sufficient to support the conclusion that enforcing" would impose substantial obstacles, endorses this conclusion, just as, under the *Fifteenth Amendment*, Section 1,"[t]he right of citizens of the United States to vote shall not be denied or abridged by the United States or by any state on account of race, color, or previous condition of servitude."

2. Petitioner further alleges, in Verified Complaint, under the authority of the *Declaratory Judgments Act*, and pursuant to *Thornburg v. Gingles*, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), Ralph Northam and the State Board of Elections violate the *Voting Rights Act of 1965*, 42 U.S.C. § 1973c (4)(f)(2) because the scheme operates to minimize or cancel the ability of conservative voters to elect their preferred candidates, creating a voter dilution bloc, within the meaning of § 2.

3. Petitioner further alleges, in Verified Complaint, under the authority of the *Declaratory Judgments Act*, and pursuant to *Lee v. Weisman*, 505 U.S. 577, 112 S. Ct. 2649, 120 L. Ed. 2d 467 (1992), finding that "[n]o person can be punished for entertaining or professing religious beliefs or disbeliefs, for church attendance or non-attendance," as well as *Cardew v. New York State Dep't of Corr. Servs.*, No. 01 CIV. 3669 (BSJ), 2004 WL 943575, at *1–9 (S.D.N.Y. Apr. 30, 2004) (citing *Farid v. Smith*, 850 F.2d 917, 926 (2d Cir.1988).), establishing that, "[i]n determining whether there is a violation of the *Free Exercise Clause*, courts must assess: "(1) whether the practice asserted is religious in the person's scheme of

beliefs, and whether the belief is sincerely held; (2) whether the challenged practice. . .

infringes upon the religious belief; and (3) whether the challenged practice. . . furthers some

legitimate. . . objective," by and through implementation of Executive Order 63, through

state and local regulations therefor, mandating the use of nonmedical grade facial coverings

in certain public settings, creates an undue burden against the free exercise rights of those,

like himself.

4. Petitioner further alleges, in Verified Complaint, under the authority of the *Declaratory*

*Judgments Act*, in accordance with the *First Amendment*, which provides that "Congress

shall make no law respecting an establishment of religion, or prohibiting the free exercise

thereof; or abridging the freedom of speech, or of the press; or the right of the people

peaceably to assemble, and to petition the government for a redress of grievances," Governor

Ralph Northam, Attorney General Mark Herring and the State Board of Elections,

individually, jointly and/or severally, worked to deny Petitioners rights to petition the

government for redress of grievances, raised within the context of his free exercise rights, as

an evangelical Christian, as well as within the context of his freedom of speech, as a

congressional candidate, when bringing challenges, facial and as applied, arising from the

state lockdown orders, which created an undue burden upon his ability worship in accordance

with the dictates of his faith, and went to the extent to violate his constitutional rights to

equal protection, in *Webb v. Northam, et al.*, Case Number CL20001624 (Alexandria Cir.

2020), evading service of process duly commenced by filing of a praecipe with the

Alexandria City Sheriff's Department, as well as in refusal, by alleged matter of policy, a

request for waiver of service, and in *Webb v. State Board of Elections*, Case Number CL20-

2459-00 (Richmond Cir. 2020), denying to his political campaign for U.S. Congress as an

-3-

independent candidate in Virginia's 8th Congressional District, in disparate treatment as to a similarly situated party, the lowered threshold granted to the plaintiff in *Omari Faulkner for Virginia, et al. v. Virginia Department of Elections, et al.*, Case No. CL-20-1456 (Richmond GDC. 2020), *on appeal Omari Faulkner for Virginia, et al. v. Virginia Department of Elections, et al.*, Case No. VLW 020-8-024 (Richmond Cir. 2020).

5.  Plaintiff further alleges that, in a scheme with the other Respondents to prevent Petitioners ability to qualify for the ballot, the County of Arlington, by and through the Courts and the Arlington Human Rights Commission, violated his equal protection rights, by having blocked his access to the courts, immediately prior to his candidacy, by imposing an unlawful sanction, and denying the existence of a *prima facie* case of discrimination and fraud, involving his former landlord, Veronica Benitz, who had presented a misrepresentation of fact, specifically that her daughter was pregnant, necessitating the use of his former studio apartment, located at 1011 Arlington Boulevard, #727, Arlington, Virginia 22204, placing petitioner in detrimental reliance to seek a new residence, after Ms. Benitz had already fraudulently extorted a sum amounting to one thousand dollars in alleged delinquent payment of the security deposit, and then refused to return $2,000 of the same deposit upon vacation, on claims of damages exceeding normal wear and tear, including a claim of a necessity to replace the entire carpet in a studio apartment.

## Basis for Jurisdiction

6.  Pursuant to 28 U.S.C. § 1331, governing federal questions, "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." Moreover, pursuant to 28 U.S.C. § 1346 (a)(2) "The district courts shall have original jurisdiction, concurrent with the United States Court of Federal Claims, of. . . [a]ny

other civil action or claim against the United States, not exceeding $10,000 in amount,

founded either upon the Constitution, or any Act of Congress, or any regulation of an

executive department." Accordingly, federal question jurisdiction is proper.

7. Pursuant to 28 U.S. Code § 1343(a):

> The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:
>
> (1) To recover damages for injury to his person or property, or because of the deprivation of any right or privilege of a citizen of the United States, by any act done in furtherance of any conspiracy mentioned in section 1985 of Title 42;
>
> (2) To recover damages from any person who fails to prevent or to aid in preventing any wrongs mentioned in section 1985 of Title 42 which he had knowledge were about to occur and power to prevent;
>
> (3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States;
>
> (4) To recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote.

8. Accordingly, federal civil rights jurisdiction is proper.

## **Statutory Causes of Action**

9. Under the *Fourteenth Amendment*, Section 1, "All persons born or naturalized in the United

States, and subject to the jurisdiction thereof, are citizens of the United States and of the state

wherein they reside. No state shall make or enforce any law which shall abridge the

privileges or immunities of citizens of the United States; nor shall any state deprive any

person of life, liberty, or property, without due process of law; nor deny to any person within

its jurisdiction the equal protection of the laws."

10. Under 28 U.S.C. § 2201(a), "[i]n a case of actual controversy within its jurisdiction, . . . any

court of the United States, upon the filing of an appropriate pleading, may declare the rights

and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought," and "[a]ny such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such. Moreover, under 28 U.S.C. § 2202 "[f]urther necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment."

11. Under 42 U.S.C. § 1983, "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia."

12. Under 42 U.S.C. § 1988, "In any action or proceeding to enforce a provision of sections 1981, 1981a, 1982, 1983, 1985, and 1986 of this title, title IX of Public Law 92–318 [20 U.S.C. 1681 et seq.], the Religious Freedom Restoration Act of 1993 [42 U.S.C. 2000bb et seq.], the Religious Land Use and Institutionalized Persons Act of 2000 [42 U.S.C. 2000cc et seq.], title VI of the Civil Rights Act of 1964 [42 U.S.C. 2000d et seq.], or section 12361 of title 34, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs, except that in any action brought

against a judicial officer for an act or omission taken in such officer's judicial capacity such officer shall not be held liable for any costs, including attorney's fees, unless such action was clearly in excess of such officer's jurisdiction."

### The Politics of Facial Coverings

13. Progressives and Democrats are concerned about voting, evidenced in recent legislation to extend the voting period to 45 days to permit voters to vote in person or by mail, Maggie Miller, "Democrats introduce bill to promote mail-in voting amid coronavirus crisis," *The Hill*, March 18, 2020,

> Voting is not enough when more than 59 million Americans live in a state where the party whose legislative candidates won fewer votes in 2018 nevertheless won control of one or both chambers of the legislature anyway.

> Voting is not enough when 33 million Americans have been purged from the voter rolls between 2014 and 2018, according to the Brennan Center. Purge rates have soared since Roberts' decision in Shelby County, especially in the states the chief justice believed prejudice was some artifact of a distant past. The purge rate is as much as 40 percent higher in states that have a demonstrated history of racial voting discrimination. Jesse L. Jackson & David Daley, "Voter Suppression Is Still One of the Greatest Obstacles to a More Just America," *TIME*, June 12, 2020.

14. And, when progressives and Democrats discuss voting, they view this complex human behavior through the lens of race, as one pundit explained during the midterms:

> The events in Georgia are part of a broader political project. The xenophobia and the resentment that Donald Trump stirred up during the 2016 election are fundamentally concerns about the future of the American electorate. (His reported comment that too many people are immigrating from "shithole countries" in Africa and the Caribbean was paired with a lament that not enough are coming from Europe.) He has repeatedly stated that he lost the popular vote because non-citizens voted for Hillary Clinton. Last Thursday, at a rally in Montana, he suggested that Democrats were responsible for a caravan of migrants now heading north from Honduras, because they "figure everybody coming in is going to vote Democrat." Jelani Cobb, "Voter-Suppression Tactics in the Age of Trump," *The New Yorker*, October 21, 2018.

15. Formulaically, the transactions of voter suppression counter an effort to increase voter participation to maximize favorable returns, and, according to Jan Leighley, a political

science professor at American University, "Candidates, campaigns (or) consultants who want to depress (voter) turnout will target those who they know would vote for the other candidate." said Jan Leighley, professor of American government at American University. Vanessa Willoughby, "What Does Voter Suppression Look Like Today?" *Rewire*, March 5, 2019.

16. However, if "[c]andidates, campaigns (or) consultants who want to depress (voter) turnout will target those who they know would vote for the other candidate," *id.*, and progressives and Democrats are concerned about 33 million purged former voters, Jesse L. Jackson & David Daley, "Voter Suppression Is Still One of the Greatest Obstacles to a More Just America," *supra*, one aspect of facial coverings raises concerns:

> Four months of discord about the coronavirus epidemic have transformed the cloth mask into a potent political symbol, touted by Democrats as a key part of communal responsibility, labeled by some GOP leaders as a sign of government overreach and as a scarlet letter pinned on the weak. Ben Guarino, Chelsea Janes & Ariana Eunjung Cha, "Spate of new research supports wearing masks to control coronavirus spread," *Washington Post*, June 13, 2020.

### The Science of Facial Coverings

17. Executive Order 63 provides:

> The Commonwealth of Virginia continues to respond to the novel coronavirus (COVID-19) pandemic. Measures undertaken over the last ten weeks have slowed the spread of the virus; however, its transmission continues to threaten our communities. We must remain vigilant. In fact, as we reopen Virginia, it is critical that we become even more vigilant. Studies of the virus show that a substantial number of individuals with coronavirus are asymptomatic. In addition, individuals who contract the virus may still transmit the virus to others before ever showing symptoms. Therefore, a person with no symptoms of the virus could spread it by speaking, coughing, or sneezing. As more people venture back to businesses, employees are put in a vulnerable position when patrons come in without a face covering. We must make sure workers are safe as they interact with customers. Science shows us that face coverings can help stop the spread of the virus. That is why the Centers for Disease Control and Prevention (CDC) recommends wearing cloth face coverings, even those made from household items or common materials in public settings. I strongly urge all Virginians to wear face coverings when leaving their homes.

But as to indoor settings to which the public has access, mere encouragement is not enough to protect the health and safety of Virginians.

**18.** Governor Northam has taken the extreme position that even a bandana would provide protection against microbial infection[1], CITE, a proposition that even the New York Times has rejected. Tara Parker-Pope, "What's the Best Material for a Mask? Scientists are testing everyday items to find the best protection from coronavirus. Pillow cases, flannel pajamas and origami vacuum bags are all candidates," *NYT*, April 20, 2020.

**19.** The gold standard for testing facial masks for personal protective equipment (PPE), is the Model 8130 Automatic Filter Tester. Staff, "Automated Filter Tester: 8130A," *TSI*, https://www.tsi.com/products/filter-testers/automated-filter-tester-8130a/ (accessed May 30, 2020).

**20.** In an effort to support strategies in preservation of PPE in the event of a pandemic, the National Institute for Occupational Safety and Health (NIOSH) commissioned a study one decade ago, simulating the effects of avian influenza A (H5N1) and the novel influenza virus A (H1N1) against a variety of household items that might be offered to the public, including even a Hanes sweatshirt. Samy Rengasamy, *et al.*, *Simple Respiratory Protection— Evaluation of the Filtration Performance of Cloth Masks and Common Fabric Materials Against 20–1000 nm Size Particles*, 54 Ann. Occup. Hyg. 7, pp. 789–798 (2010), and it is significant that Respondents have both abandoned the gold standard for testing the efficacy of PPE, and ignored this study that was a part of the contingency planning for a pandemic event, especially since, even with optimal conditions embedded in the study for its success, it

---

[1] "They don't need to be medical grade; you can make your own. All you need is a piece of cloth and some rubber bands. You can even grab a bandana." Lowell Feld, "Live Video, Highlights: Gov. Ralph Northam's Tuesday (5/26) Virginia COVID-19 Briefing," *Blue Virginia*, May 26, 2020.

still yet failed to endorse a conclusion that anything less than medical grade protection might

provide a sufficient barrier against microbial infection, specifically stating in cautionary

scientific prose:

> To address the filtration performance of common fabric materials against nano-size
> particles including viruses, five major categories of fabric materials including sweatshirts,
> T-shirts, towels, scarves, and cloth masks were tested for polydisperse and monodisperse
> aerosols (20–1000 nm) at two different face velocities (5.5 and 16.5 cm s21) and
> compared with the penetration levels for N95 respirator filter media. The results showed
> that cloth masks and other fabric materials tested in the study had 40–90% instantaneous
> penetration levels against polydisperse NaCl aerosols employed in the National Institute
> for Occupational Safety and Health particulate respirator test protocol at 5.5 cm s21.
> Similarly, varying levels of penetrations (9–98%) were obtained for different size
> monodisperse NaCl aerosol particles in the 20–1000 nm range. The penetration levels
> of these fabric materials against both polydisperse and monodisperse aerosols were much
> higher than the penetrations for the control N95 respirator filter media. At 16.5 cm s21
> face velocity, monodisperse aerosol penetrations slightly increased, while polydisperse
> aerosol penetrations showed no significant effect except one fabric mask with an
> increase. Results obtained in the study show that common fabric materials may provide
> marginal protection against nanoparticles including those in the size ranges of virus-
> containing particles in exhaled breath.

21. Both the Centers for Disease Control and Dr. Anthony Fauci until recently at least implicitly

endorsed the findings of the NIOSH study, while also engaging in development of strategies

to preserve PPE, to include recommendations for withdrawing medical grade masks from

visitor areas in hospitals, as well as cancelling elective surgeries at the beginning of the

public health crisis. *See* Staff, "Strategies for Optimizing the Supply of Facemasks," *CDC*,

March 17, 2020, https://www.cdc.gov/coronavirus/2019-ncov/hcp/ppe-strategy/face-

masks.html (accessed May 5, 2020).

22. Researchers have determined that the SARS-CoV-2 particle is suspended in medium to large

sized water droplets, measuring 5 to 10 microns (μ) which science has long determined,

possess no aerosol, or "airborne" capability and, therefore, find their trajectory quickly

subjected to gravity, and "quickly fall to the ground or on nearby objects after it's expelled,"

limiting the distances the particle will travel. Sarah Gibbens, "See how a sneeze can launch germs much farther than six feet," *National Geographic*, April 17, 2020.

23. An N95 medical grade mask has added protection against these water droplets because they are, by design, hydrophobic, and work to repel the droplet, while a surgical mask or homemade substitute is hydrophilic, and will absorb the moisture from the droplet, Onur Aydin, *et al.*, "Performance of fabrics for home-made masks against spread of respiratory infection through droplets: a quantitative mechanistic study," medRxiv preprint doi: https://doi.org/10.1101/2020.04.19.20071779 (April 24, 2020),[2] creating, essentially a "COVID-19 Catcher" on a person's face, if it happens to be found down range of a projectile droplet.

24. In addition to droplet size, medical masks must also create a barrier against the particulate mass of the microbe, and scientists validate that the SARS-CoV-2 virus particle measures 0.060-0.14μ ("microns," or "μm,") (60 to 140 nm (nanometers)). Zvi Bar-Yam & Yaneer Bar-Yam, "The Potential for Screening and Tracking of COVID-19 Using Particle Counters, Version 2," New England Complex Systems Institute, March 29, 2020, but, in contemporary context, the smallest presentation of the active ingredient for tear gas measures 0.6 microns, or six times larger than the largest configuration for a SARS-CoV-2 particle. National

---

[2] This study served as the basis for all of the assumptions in a recent facial mask study, based upon projection modelling of "R Values," Richard O. J. H. Stutt, *et al.*, *A modelling framework to assess the likely effectiveness of facemasks in combination with 'lock-down' in managing the COVID-19 pandemic*, Proc. R. Soc. A 476: 20200376. http://dx.doi.org/10.1098/rspa.2020.0376 (June 10, 2020), publicized by the New York Times, heralding "R Values." "Widespread Mask-Wearing Could Prevent COVID-19 Second ..." *NYT*, June 10, 2020 (deleted). *See also* Jeremy R. Hammond, "New York Times Laughably Lies That the Mask Debate Is 'Settled'," *Jeremy R. Hammond*, June 5, 2020.

Research Council, "Acute Exposure Guideline Levels for Selected Airborne Chemicals: Volume 16," *National Academies Press* (2014).

25. Prompting even a new study by the Royal Society, Richard O. J. H. Stutt, *et al.*, *A modelling framework to assess the likely effectiveness of facemasks in combination with 'lock-down' in managing the COVID-19 pandemic*, Proc. R. Soc. A 476: 20200376. http://dx.doi.org/10.1098/rspa.2020.0376 (June 10, 2020), at first loudly endorsed by the New York Times, but in a now deleted article, "Widespread Mask-Wearing Could Prevent COVID-19 Second ..." *NYT*, June 10, 2020 (deleted), recent research, Derek K Chu, *et al.*, "Physical distancing, face masks, and eye protection to prevent person-to-person transmission of SARS-CoV-2 and COVID-19: a systematic review and meta-analysis, *The Lancet* (June 1, 2020) https://doi.org/10.1016/S0140-6736(20)31142-9, comprised of what even the researchers described as a hasty review of "172 observational studies across 16 countries and six continents, with no randomised controlled trials and 44 relevant comparative studies in health-care and non-health-care settings," prepared after May 3, 2020, regarding MERS, SARS and SARS-CoV-2, could only definitively state the obvious conclusion that a medical grade mask may provide the best protection against microbial infection.

26. Promoting the study, even the lead researcher was quoted in a widely disseminated article, albeit buried deep below the misleading headline:

> "Our findings suggest, in multiple ways, that the use of masks is highly protective in health-care and community settings," said the author of the review, Holger Schünemann, an epidemiologist and physician at McMaster University in Ontario.
>
> But that conclusion came with an important caveat: "We have low certainty in that," Schünemann said, meaning the authors cannot be strongly confident in the result. Ben Guarino, Chelsea Janes & Ariana Eunjung Cha, "Spate of new research supports wearing masks to control coronavirus spread," *supra*.

## The Law of Facial Coverings

27. Executive Order 63 provides that:

> Studies of the virus show that a substantial number of individuals with coronavirus are asymptomatic. In addition, individuals who contract the virus may still transmit the virus to others before ever showing symptoms. Therefore, a person with no symptoms of the virus could spread it by speaking, coughing, or sneezing. As more people venture back to businesses, employees are put in a vulnerable position when patrons come in without a face covering. We must make sure workers are safe as they interact with customers.

28. In the seminal case of *Chevron U.S.A., Inc. v. N.R.D.C., Inc.,* 467 U.S. 837, 104 S. Ct. 2778,

81 L. Ed. 2d 694 (1984), the High Court held that,"[w]hen a challenge to an agency

construction of a statutory provision, fairly conceptualized, really centers on the wisdom of

the agency's policy, rather than whether it is a reasonable choice within a gap left open by

Congress, the challenge must fail," and "[s]uch legislative regulations are given controlling

weight unless they are arbitrary, capricious, or manifestly contrary to the statute," but, herein,

the condition precedent is the agency's wisdom.

29. There is no question but that the courts have determined that in furtherance of a legitimate

state interest, the regulation "must effectuate the change in the least restrictive manner to

justify imposing obstacles," through regulations that bear a "'rational relationship' with

'some legitimate government purpose.'" *Whole Woman's Health v. Hellerstedt*, 579 U.S.

___136 S. Ct. 2292 (2016),

30. It is well-established that, "'[a] facial challenge to a legislative Act is, of course, the most

difficult challenge to mount successfully, since the challenger must establish that no set of

circumstances exists under which the Act would be valid," *McCullen v. Coakley*, 573 F.

Supp. 2d 382 (D. Mass. 2008), *aff'd,* 571 F.3d 167 (1st Cir. 2009) (quoting *U.S. v. Salerno,*

-13-

481 U.S. 739, 107 S.Ct. 2095 (1987)), and under the rule stated in *Thompson v. Bacon*, 245

Va. 107, 425 S.E.2d 512 (1993),

> A party alleging fraud must prove by clear and convincing evidence (1) a false
> representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with
> intent to mislead, (5) reliance by the party misled, and (6) resulting damage to him. *Winn
> v. Aleda Constr. Co.*, 227 Va. 304, 308, 315 S.E.2d 193, 195 (1984). Clear and
> convincing evidence is such proof as will establish in the trier of fact a firm belief or
> conviction concerning the allegations that must be established. *Walker Agency, Inc. v.
> Lucas*, 215 Va. 535, 540-41, 211 S.E.2d 88, 92 (1975).

31. Conceding that the homemade masks are not medical grade, a former army surgeon,

endorsed his own recommendation, stating that he wore the medical mask when he travelled

outside, and "Northam, a pediatric neurologist, said wearing a mask helps prevent droplets

from sneezing or coughing from being released into the air and onto surfaces," Marie

Albiges, "Northam recommends wearing masks to help prevent coronavirus spread in

public," *supra*, a statement patently false, especially within the context in which it was made.

32. In *U.S. v. Daane*, 475 F.3d 1114 (9th Cir. 2007) (emphasis added), the Court observed,

> In *United States v. Zappola*, 677 F.2d 264 (2d Cir.1982), the Second Circuit opined that a
> claim of right defense is unwarranted in cases involving the use of force. The Second
> Circuit distinguished *Enmons* as limited to cases involving legitimate labor strikes. *Id.* at
> 269. The Second Circuit clarified that:
>
> > [B]y adopting the states' statutory law of extortion, Congress meant to punish as
> > extortion *any effort to obtain property by inherently wrongful means, such as
> > force or threats of force* ..., regardless of the defendant's claim of right to the
> > property.... We agree with the other circuits that have addressed this issue that
> > *Enmons* merely carved out a labor exception to the traditional law of extortion
> > codified in the *Hobbs Act*.
>
> *Id.* at 268–69 (citations omitted).

33. Yet, Respondents went further than a fraudulent scheme that, to date, has claimed 1,740

lives, to date, Staff, "COVID Cases in Virginia," *CDC*,

https://www.vdh.virginia.gov/coronavirus/ (accessed June 30, 2020), over half of whom are

the elderly, residing in nursing homes, Staff, "44 new deaths linked to COVID-19 in

Virginia; 940 new coronavirus cases reported," *Inside Nova*, May 3, 2020, a well-known risk

from early on, *WHO Joint Mission Report*, February 24, 2020.

**34.** Pursuant to Va. Code § 18.2-29,

> Any person who commands, entreats, or otherwise attempts to persuade another person to
> commit a felony other than murder, shall be guilty of a Class 6 felony. Any person age
> eighteen or older who commands, entreats, or otherwise attempts to persuade another
> person under age eighteen to commit a felony other than murder, shall be guilty of a
> Class 5 felony. Any person who commands, entreats, or otherwise attempts to persuade
> another person to commit a murder is guilty of a felony punishable by confinement in a
> state correctional facility for a term not less than five years or more than forty years.

**35.** Yet, under the encouragement and assurances of Respondent Northam, and others,

municipalities, like the City of Alexandria, went to the extent to invite churches, deemed

nonessential social gatherings under the lockdown orders, to aid in the manufacture of these

inadequate substitutes to provide to the impoverished.

**36.** Accordingly, it would work a manifest injustice not to grant temporary injunctive relief.

It has been established that, pursuant to the policy directive promulgated by Respondents

32. Northam, Oliver and VDH, Respondents Justin Wilson and the City of Alexandria did solicit

the church with which Petitioner is affiliated as a member, and,under the laws of the

Commonwealth,  under *In re Extradition of Exoo*, 522 F. Supp. 2d 766 (S.D.W. Va. 2007)

(quoting *State v. Willis*, 255 N.C. 473, 121 S.E.2d 854 (1961)), "[t]he Court stated that '[s]ince

suicide is a crime, one who aids and abets another in, or is accessory before the fact to, self

murder is amenable to the law.'"

**37.** Moreover, the Governor has advanced this requirement for facial coverings, despite

legislative deliberations that have determined the risk they pose to public safety, in crime

detection and avoidance, Va. Code § 18.2-422, in disregard for due process considerations

regarding whether probable cause exists that a person required to wear a mask is infected by

the virus, "presents an imminent danger to himself or others as a result," "is in need of

hospitalization or treatment, and. . . is unwilling to volunteer or incapable of volunteering for

hospitalization or treatment." *See* Va. Code § 37.2-808(A).

**38.** Moreover, while the grant of discretion for the exercise of the police power is broad in

matters of public health, it is not plenary nor absolute. For instance, in *City of Chesapeake v.*

*Cunningham*, 268 Va. 624, 604 S.E.2d 420 (2004), the Court found:

> The City's decision to remove the air stripping towers and to construct the reverse
> osmosis system, with the knowledge that TTHM levels would rise, was an exercise of the
> City's legislative discretion and its inherent police power. "[T]he determination of the
> public improvements to be made by a municipality [is] a legislative function." *Leonard v.*
> *Town of Waynesboro*, 169 Va. 376, 385, 193 S.E. 503, 507 (1937). *Deciding that the*
> *long-term gains to Chesapeake residents outweighed the short-term potential dangers to*
> *the public health,* the City undertook the improvements and *made an effort to alleviate*
> *the danger to the public by widely publicizing the known hazards* to women who were or
> might become pregnant. *The Commissioner verified this decision as he "determined that*
> *the granting of an exemption to the TTHMs standard will not result in an unreasonable*
> *risk to the consumer's health."* Municipal decisions regarding the determination of
> priorities directly related to the general health, safety and welfare of citizens are exercises
> of a governmental function. *See Gambrell*, 267 Va. at 359, 593 S.E.2d at 250.

**39.** In contrast to the Governor, in *Cunningham*, the Court found that the defendant had "issued

three separate papers publicizing the water warnings: a Public Health Bulletin ("the

Bulletin") on March 31, 1998, and a news release ("the News Release") and public notice

("the Notice") on April 1, 1998." Unlike Respondents who allege generally that "studies of

the virus show that a substantial number of individuals with coronavirus are asymptomatic,"

and broad claims that "[s]cience shows us that face coverings can help stop the spread of the

virus," the defendants in *Cunningham*, provided the general public with warnings that

"summarized the results of the California study, explained that the City's TTHM levels

would temporarily spike while the air stripping towers were off-line, and gave instructions

for precautions pregnant women should take in the interim period."

40. Furthermore, "[t]he City set up recorded messages with health risk information and reports of

weekly TTHM levels on the City's Water Quality Hotline and Answerline, a CDH phone

bank," and furthermore,

> CDH faxed the Bulletin to Chesapeake obstetricians and gynecologists, family
> practitioners, internists, CDH Supervisors, City officials, the Chesapeake Public School
> Administration, newspapers, television and radio station news departments, Chesapeake
> General Hospital officials, Cox Communications and VDH officials. On March 31, 1998,
> CDH faxed a copy of the Bulletin to Cunningham's obstetrician, Dr. Timothy Hardy.
> Media outlets provided extensive coverage of the water warnings. There were 22
> television news reports between March 31, 1998, and May 4, 1998. The Virginian–Pilot
> included articles about the warning and Chesapeake's water quality 15 times from April 1
> through December 21. The Chesapeake Post ran one article on April 17. Some articles
> contained listings of fire stations where affected residents could pick up free drinking
> water.

> The City posted the Notice on its cable television bulletin board, at Public Utilities
> Department Offices, and on the City's Internet homepage. The City distributed copies to
> City libraries and recreation centers, mailed 73,062 copies of the Notice to all postal
> patrons in Chesapeake and sent 13,620 copies of the Notice home with elementary school
> students. Cunningham was a Chesapeake postal customer in April of 1998 but testified
> that she did not receive the Notice at that time "because people stole [her] mail."
> The City began mailing copies of the Notice to new water customers in May of 1998 and
> continued until June 11, 1999. On September 21, 1998, Cunningham, then known by her
> maiden name, Helen L. Stringfield, signed up for City water service. Ms. Stringfield's
> water service was activated on September 30, 1998. The New Customers Report run on
> October 1, 1998, lists "Stringfield[,] Helen L [.]" among 31 new customers. The
> Department of Public Utilities received this report on October 2, 1998, and mailed a
> cover letter and Notice to Ms. Stringfield that day.

> Cunningham claims that the City's water supply has historically exceeded regulatory
> limits for THMs, that the City knew that high levels of THMs were harmful to her health
> and that of her unborn child, that the City took steps to conceal both the high levels of
> THMs in the water and the deleterious effects on water consumers. She alleges that when
> the City finally undertook a public notice campaign, that effort was inadequate because
> the City failed to inform her individually of the consequences of consuming City water.

41. Falling far short of this minimal standard for exercise of the police power, and, in a manner
    that withdrew, under penalty of felony prosecution, medical grade protection, in substitution
    for protection during a declared public health emergency, albeit not at the threshold of a local
    epidemic, see Staff, "COVID View: A Weekly Surveillance of U.S. COVID-18 Activity,
    May 2, 2020," *CDC*, May 8, 2020 https://www.cdc.gov/coronavirus/2019-ncov/covid-
    data/covidview/index.html (accessed May 9, 2020), it is clear that, at a minimum, a
    temporary restraining order regarding the mandate for face coverings is proper.

42. At his weekly "COVID-19 Update Briefing," in harmony with Democrat Party leaders in
    Northern Virginia, Respondent Northam, who, to date has yet to respond or return service to
    a complaint filed on April 2, 2020, twice applauded, the decision of the Supreme Court in
    *Regents of the University of California*, No. 18–587, 591 U.S., at ___ , Governor Ralph
    Northam, "I'll be in Northern Virginia at 2:00 PM this afternoon to share the latest on
    COVID-19 in our Commonwealth. . ." *Facebook*, June 18, 2020,
    https://www.facebook.com/watch/?v=266686721059875 (accessed June 20, 2020), and,
    presumptively, he understood that that decision did "not decide whether DACA or its
    rescission are sound policies," but, rather, focused on a finding of insufficient rational
    reasoning to satisfy constitutional muster, and that held that "[j]udicial review of agency
    action. . . is limited to 'the grounds that the agency *invoked when it took the action*,'" *DHS v.
    Regents of the University of California*, 591 U.S. ___ (2020) (quoting from *Michigan v. EPA*,
    576 U. S. 743 (2015)), a holding dispositive to the issues in this case and hearing on a
    demurrer motion.

43. "For purposes of arbitrary-and capricious review, it does not matter whether the latest official explanation was two years ago or three years ago. What matters is whether the explanation was reasonable and followed the requisite procedures." *Id.*

44. Recognizing that "[t]he Government's regulatory interest in community safety can, in appropriate circumstances, outweigh an individual's liberty interest," the nation's highest court has stated, "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *U.S. v. Salerno*, 481 U.S. 739, 107 S. Ct. 2095, 95 L. Ed. 2d 697 (1987).

45. In that case, the High Court found dispositive the following factual findings:

> The *Act narrowly focuses on a particularly acute problem*-crime by arrestees-in which the Government's interests are overwhelming. Moreover, the *Act operates only on individuals who have been arrested for particular extremely serious offenses*, and *carefully delineates the circumstances* under which detention will be permitted. *Id.*

46. For a finding of that which was clearly erroneous, a "reviewing court on the entire evidence. . . [would be] left with the definite and firm conviction that a mistake has been committed," *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 564–82, 105 S. Ct. 1504, 1506–16, 84 L. Ed. 2d 518 (U.S. 1985) (quoting *U.S. v. United States Gypsum Co.*, 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948)), and no rational person considering the rejections of established science by Respondents would conclude that the executive orders were not prudent nor safe, particularly with regard to national security, and causing, directly and proximately, unjustifiable suffering and loss of life.

## Claims Against Respondents

47. The following claims are brought in civil suit against Respondents:

### *Governor Northam*

48. There being no genuine issue of material fact as to whether, at the time of promulgation, Governor Northam possessed any scientific rational basis for mandating the wearing of nonmedical grade facial coverings in certain public settings, it is clear that with regard to the mandating of masks in polling places and places of worship, there is no circumstances under which such a regulation would be lawful, and, accordingly, Petitioner seeks a declaratory judgment as to the unconstitutionality, as applied, of this mandate, and such equitable relief as deemed appropriate by this Honorable Court.

49. Moreover, pursuant to 42 U.S.C. § 1988, Petitioner is entitled to reasonable attorney's fees.

### *State Board of Elections*

50. There being no genuine issue of material fact as to whether, at the time of promulgation, the State Board of Elections possessed any scientific rational basis for mandating the wearing of nonmedical grade facial coverings in certain public settings, it is clear that with regard to the mandating of masks in polling places, there is no circumstances under which such a regulation would be lawful, and, accordingly, Petitioner seeks a declaratory judgment as to the unconstitutionality, as applied, of this mandate, and such equitable relief as deemed appropriate by this Honorable Court.

51. Moreover, pursuant to 42 U.S.C. § 1988, Petitioner is entitled to reasonable attorney's fees.

### *Mark Herring*

52. There being no legitimate state interest for Mark Herring, under color of law, to violate Petitioner's *First Amendment* rights to free exercise of religion, as an evangelical Christian, his rights to free speech as a candidate for U.S. Congress, nor his right to petition the government in redress of grievances, or to deny his rights to equal protection, guaranteed by

-20-

the *Fourteenth Amendment*, pursuant to 42 U.S.C. § 1988, Petitioner is entitled to reasonable attorney's fees.

### *County of Arlington*

53. There being no legitimate state interest for the County of Arlington, under color of law, to violate Petitioner's *First Amendment* rights to free speech as a candidate for U.S. Congress, nor his right to petition the government in redress of grievances, or to deny his rights to equal protection, guaranteed by the *Fourteenth Amendment*, pursuant to 42 U.S.C. § 1988, Petitioner is entitled to reasonable attorney's fees.

### Conclusion, Certification and Verification

54. Under Va. Code § 8.01-271.1, "The signature of an attorney or party constitutes a certificate by him that (i) he has read the pleading, motion, or other paper, (ii) to the best of his knowledge, information and belief, formed after reasonable inquiry, it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and (iii) it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation," and, in conforming form, Petitioner presents this signed and sworn pleading to the Court. So help him God.

55. I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

56. I further declare under penalty of perjury that no attorney has prepared, or assisted in the preparation of this document.

**WHEREFORE**, Petitioner prays, for the reasons argued above, under penalty of sanction for

vexatious or frivolous pleadings, Executive Order 63 will be declared unconstitutional in this

as applied challenge, that the Court will award reasonable attorney's fees to recover the cost

of seeking redress for the grievances noted above, and that the Court may direct any and all

other equitable relief deemed to be proper, in accordance with the Court's good judgment

and in the furtherance of justice.

All the above statements are true to the best of my knowledge, and I understand that a false

statement in this Verified Complaint may subject me to penalties of perjury.

Michael D. Webb, a/k/a Major Mike Webb
1210 S. Glebe Rd, #40391
Arlington, Virginia  22204
Phone: (856) 220-1354
Email: GiveFaithATry@gmail.com

Executed on: _____ 6-30-20 _____ (Date)

Subscribed, acknowledged and sworn to before me, the undersigned Notary Public in the

County of ___Richmond City___, in the Commonwealth of Virginia, this

___30th___ day of ___June___, 20 __20__ .

NOTARY PUBLIC

My commission expires: 02-29-2024  Registration Number: 7866449

TYEE ALLEN
NOTARY PUBLIC
REGISTRATION # 7866449
COMMONWEALTH OF VIRGINIA
MY COMMISSION EXPIRES
FEBRUARY 29, 2024